# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2809

———————

Gary D. Wallace,

        Appellant,

        v.

Sparks Health System; Sparks
Regional Medical Center,

        Appellees.

\* Appeal from the United States
\* District Court for the
\* Western District of Arkansas.

———————

Submitted: March 18, 2005
Filed: July 20, 2005

———————

Before RILEY, BOWMAN, and GRUENDER, Circuit Judges.

———————

BOWMAN, Circuit Judge.

Gary D. Wallace appeals from an order of the District Court[1] granting summary judgment in favor of Sparks Health System and Sparks Regional Medical Center (collectively, "Sparks") on Wallace's claims of retaliation and wrongful discharge. We affirm the District Court.

---

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

# I.

For nearly twenty years, Sparks employed Wallace as a transporter of patients in the surgery department of the Sparks Regional Medical Center facility. By 2002, Wallace was the only transporter in the surgery department on the evening shift. Theresa Goss also worked as a transporter in the surgery department, but on the day shift, resulting in a two-hour overlap of her shift and Wallace's shift from 2:30 p.m. to 4:30 p.m. Dee Ann Wilcox was Wallace's evening-shift supervisor. Marquita Johnson-Bailey, the director of surgical services, supervised Wilcox and was in charge of the surgery department.

Wallace frequently complained to Wilcox that Goss "intimidated" him by being "physically more aggressive" in transporting patients before Wallace had a chance to do so. Wallace Dep. at 23, 39. Wallace believed that Wilcox allowed such intimidation by Goss because Wilcox preferred female employees, and Wallace felt that Sparks fostered a "sexually intimidating environment" against men. Id. at 40. In addition, Wallace stated that Wilcox would yell at him and be "[v]erbally abusive" about "[m]ost anything." Id. at 26, 27. Wilcox countered that Wallace "objected if other people in the department did similar job duties" and that Wallace's complaints "had gotten somewhat worse over the last several years." Wilcox Dep. at 20, 21. Wilcox felt that Wallace's complaints resulted from his lack of "understanding of how everybody's job role worked together." Id. at 19. Indeed, Wallace had a minor confrontation with a male doctor on at least one occasion when Wallace felt the doctor was transporting a patient too quickly. Goss, for her part, flatly denied intimidating Wallace or being physically aggressive in order to transport patients ahead of him, and Goss stated that she did not feel favored based on her gender.

Nevertheless, Wallace believed Sparks was discriminating against him based on his gender, and he filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") in June 2002. He alleged that Sparks had

violated his civil rights under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). See 42 U.S.C. §§ 2000e–2000e-16 (2000). His EEOC complaint resulted in a mediated settlement that was finalized in September 2002. Wilcox, Johnson-Bailey, and Sharon Beauchamp, the director of human resources, were all irritated by Wallace's EEOC complaint because they felt Wallace's charges of discrimination were baseless, but they agreed to the settlement because its requirements were innocuous.

In the settlement, Wallace agreed to request closure of his EEOC claim and not to sue Sparks under Title VII. The parties also agreed that Sparks would not admit having violated Wallace's rights. Sparks would, however, develop a new policy regarding harassment and discrimination and make a "good faith effort" to distribute a revised employee handbook stating the new policy. EEOC Mediation Settlement Agreement at 1. Sparks also agreed to conduct meetings involving Wallace, Johnson-Bailey, Wilcox, Beauchamp, and other appropriate persons regarding "conflict management, team building, or other appropriate topics." Id. at 2. After the mediation, according to Wallace, he told Johnson-Bailey about Wilcox's yelling at him, and Johnson-Bailey told him, "[D]on't complain so you won't be yelled at. Don't ask any questions." Wallace Dep. at 28. She also allegedly told him "she could not function and run [the surgery] department with the trouble [Wallace] was causing." Id. at 17.

Pursuant to the settlement agreement, Sparks conducted one conflict-resolution meeting in January 2003, but Wallace became surprised that most of the attention and questions during the meeting were directed at him, so he excused himself and walked out. Sparks also enhanced its prior harassment and discrimination policy, but decided against distributing a revised handbook on a company-wide basis. Instead, Sparks distributed the revised handbook only to new employees and as replacements for lost handbooks.

By spring 2003, Sparks was experiencing financial difficulties resulting from a decrease in patients, and its management decided to perform a reduction in force ("RIF"). Johnson-Bailey, who had the authority to make staff reductions in the surgery department, stated that she made a decision to eliminate Wallace's position as the only evening-shift transporter based on a decreased number of surgeries being performed during that shift. Johnson-Bailey determined that scrub technicians and registered nurses could perform transport work during the evening shift if necessary. In addition, members of a central transport team, who transported patients in areas other than the surgery department, could be called in for assistance when needed. Johnson-Bailey reiterated in a deposition that she had decided to eliminate Wallace's position, not to discharge Wallace for job-performance reasons. She also eliminated the position of her own husband, who worked as a nurse in the surgery department, as well as Goss's position as a transporter on the day shift.

Sparks notified Wallace in a memo dated May 7, 2003, that his position would be eliminated on June 30, 2003. The memo stated that there was "no reasonable expectation that [Wallace's] position will be reinstated and thus economic separation is necessary." Memorandum from Human Resources to Wallace of May 7, 2003. The memo also stated that Wallace "will . . . be placed on a priority rehire list and will be contacted by the Human Resources Department if a position becomes available for which a separated employee may be eligible through experience, training, education and/or other qualifications." Id. Wallace then received an information sheet stating that human resources would assist employees with their job search, continuation of benefits provisions, and reference letters. After Wallace was notified of the impending RIF, Johnson-Bailey informed him that he should contact human resources prior to his discharge and watch for job postings to see if other positions became available.

Sparks routinely posted open positions on a billboard in the human resources department, in the cafeteria, and on the Internet. During the period between Wallace's

-4-

notification of the RIF and his discharge, Sparks allegedly posted as available two part-time positions on the central transport team. One position was filled by a respiratory therapist whose position had been eliminated and who was seeking to maintain employment and benefits with Sparks. Wallace, who stated he was not aware of the open positions, never applied for either position even though he was fully qualified. Wallace stated that he never visited or contacted human resources to inquire because he was "afraid and intimidated [by human resources,] . . . [his] civil rights had been violated," and "there was enough reason for [him] to stay away." Wallace Dep. at 5. He stated that he looked at the postings in the cafeteria "periodically" and that although he "may not have seen every posting," he did not remember seeing the part-time transporter positions posted. Id. at 15.

But Beauchamp, as the director of human resources, stated that she became curious why Wallace had not contacted her about the two part-time transporter positions that were open. She stated that during a Displaced Workers Workshop she asked Wallace if he was interested in applying for one of the positions, but Wallace indicated he was not interested. Wallace stated that he did not remember being told of the open transporter positions at the workshop, but Sparks employee Theresa Phillips confirmed that she was at the workshop and witnessed this exchange between Beauchamp and Wallace.

Sparks eventually discharged Wallace on June 30, 2003, along with 135 other Sparks employees. Wallace immediately filed a second complaint with the EEOC on July 8, 2003, charging that Sparks had retaliated against him for filing his initial EEOC complaint. In response, the EEOC issued Wallace a "Dismissal and Notice of Rights" form stating, "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes," but also that "[t]his does not certify that [Sparks] is in compliance with the statutes." Dismissal and Notice of Rights, U.S. Equal Employment Opportunity Comm'n, Jul. 15, 2003

(responding to complaint filed by Gary D. Wallace). The Dismissal also notified Wallace of his right to sue Sparks under Title VII and other statutes.

Wallace filed suit against Sparks on August 28, 2003, alleging retaliation under both Title VII and the Arkansas Civil Rights Act of 1993 ("ACRA"), see Ark. Code Ann. §§ 16-123-101 to -108 (Michie Supp. 2003), and alleging two state-law claims for wrongful discharge—one in contract and one in tort. Sparks answered Wallace's complaint on September 15, 2003, then removed the suit to federal court and moved for summary judgment on all of Wallace's claims. The District Court granted summary judgment in favor of Sparks after finding that Wallace had failed to establish a prima facie case of retaliation. Specifically, Wallace had failed to show a causal link between his EEOC complaint and his discharge. The District Court also ruled that Wallace had failed to establish his state-law claims for wrongful discharge.

Meanwhile, on or about the day it filed an answer to Wallace's complaint, Sparks rehired him to the central transport team, on the day shift, at the same rate of pay he had received before his discharge but without the shift differential he had received for working on the evening shift. Sparks also rehired Wallace as a new employee with no seniority pursuant to a policy specifying that an employee must be rehired within thirty days of economic separation to retain seniority status. Wallace continues to work at Sparks to this day, but he believes that Sparks only rehired him in order to mitigate his damages in the lawsuit. He appeals the District Court's grant of summary judgment in favor of Sparks.

## II.

We review de novo the District Court's grant of summary judgment. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006 (8th Cir. 2005). We will affirm if there is no genuine issue of material fact and Sparks is entitled to judgment as a matter of law. Id. We view the evidence in the light most favorable to Wallace, the non-moving

party, and draw all reasonable inferences in his favor. Id.; Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005).

## A.

To establish a prima facie case of retaliation under Title VII, Wallace needed to show that he engaged in statutorily protected activity, that Sparks took an adverse employment action against him, and that there was a causal link between the two actions. Pope, 406 F.3d at 1010. It is undisputed that Wallace's filing of an EEOC complaint based on gender discrimination was protected activity under Title VII, see id., and that Wallace's discharge was an adverse employment action by Sparks, see Okruhlik v. Univ. of Ark., 395 F.3d 872, 879 (8th Cir. 2005). The survival of Wallace's claims therefore depended upon establishing a causal link between his EEOC complaint and his discharge. The District Court found that Wallace had not shown this causal link. We agree.

We are mindful that an employee must be shielded from retaliation for protected activity, even if a court eventually decides that the employee's complaints are without merit, as long as the employee reasonably believed the employer's conduct violated Title VII. Peterson, 406 F.3d at 524 n.3. But filing an EEOC complaint does "not insulate an employee from discipline for . . . disrupting the workplace." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.), cert. denied, 528 U.S. 818 (1999). Thus, Wilcox's mild comments on Wallace's commendatory 2002 performance evaluation regarding his "difficulty recognizing the team effort and supporting it" do not establish retaliation.[2] Sparks Health System Performance Evaluation, July 18, 2002, at 4 (regarding Gary D. Wallace).

---

[2]We note that the performance score Wallace received on this evaluation entitled him to receive the highest pay increase possible.

Similarly, the comments made by Johnson-Bailey after the EEOC mediation that Wallace should stop causing trouble and the general irritation regarding his EEOC complaint are distinguishable from the comments made by the plaintiff's supervisor in <u>Watson v. O'Neill</u>, 365 F.3d 609 (8th Cir. 2004). In <u>Watson</u>, the plaintiff's supervisor told the plaintiff he "would never excel" at the company because he had provided an affidavit in an EEOC discrimination case against the supervisor. <u>Id.</u> at 612. We held that these comments established a causal link for the retaliation claim in that case. Although our analysis of those comments was brief, the comments on their face linked the plaintiff's prior EEOC activity to the decision not to promote him. By contrast, Johnson-Bailey's comments on their face do not establish any link between Wallace's EEOC complaint and the decision to eliminate his position during the RIF. The fact that Sparks's management personnel were irritated by Wallace's EEOC complaint, which they felt was baseless and which was never determined to be valid, would not establish retaliation without some showing that this irritation was linked to Wallace's discharge.

Nor is the timing of Wallace's discharge sufficient to establish retaliation because more than temporal proximity is needed to show a causal link between the discharge and the filing of the EEOC complaint. <u>See</u> <u>Kiel</u>, 169 F.3d at 1136. The cases that have accepted temporal proximity alone as sufficient to create an inference of a causal link have uniformly held that the temporal proximity must be "very close." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (citing cases in which a three-month period and a four-month period, respectively, were insufficient to establish a causal link); <u>see</u> <u>Dhyne v. Meiners Thriftway, Inc.</u>, 184 F.3d 983, 989 (8th Cir. 1999) (stating that a four-month gap, standing alone, weakened the showing of a causal link in a retaliation claim). Here, nearly a year passed between Wallace's

filing of an EEOC complaint and his discharge.[3]  This passage of time is insufficient to show, and in fact weakens the showing of, the required causal link.

Wallace's attempt to create issues as to whether Sparks had the obligation to inform him of the open transporter positions and whether he was actually informed of those positions also falls short of showing a causal link between his EEOC complaint and his discharge. Sparks discharged 136 employees during the RIF, many of whom were apparently proactive in securing other positions within the company. Wallace was given the notice and the wherewithal to help himself in his search for re-employment with Sparks, and it appears he chose not to help himself.  This seriously undermines Wallace's implication that Sparks withheld information about open positions from him in retaliation for his EEOC complaint.

Also unconvincing is Wallace's attempt to dispute whether Johnson-Bailey or Beauchamp actually made the ultimate decision to eliminate his position.  The existence of such an issue would not establish the critical showing Wallace needed to overcome summary judgment, i.e., that there was a causal link between his filing an EEOC complaint and his discharge during the RIF.  Because he failed to establish this causal link, he failed to show a prima facie case of retaliation by Sparks, and summary judgment in favor of Sparks was warranted.

---

[3]Although Wallace attempts to shorten this time period by asserting that he engaged in protected activity as late as January 2003, he has not pointed to anything in the record that would show he engaged in protected activity at that time.  There is no allegation that Wallace complained about Sparks's failure to comply with the EEOC settlement agreement.  Rather, Wallace by his own admission refused to honor fully his commitment to engage in conflict-management meetings as required by the agreement.

## B.

Even if Wallace had shown a prima facie case of retaliation, we would still affirm the District Court's grant of summary judgment based on Wallace's failure to overcome Sparks's legitimate reason for discharging him. Once a plaintiff has shown a prima facie case of retaliation, the burden shifts to the employer to show a legitimate, nonretaliatory basis for the adverse employment action. Peterson, 406 F.3d at 524. The employer's burden is not onerous and the showing need not be made by a preponderance of the evidence. Pope, 406 F.3d at 1007. The plaintiff then bears the ultimate burden of showing that the employer's proffered reason was a mere pretext for a retaliatory motive. Peterson, 406 F.3d at 524. To carry this burden, the employee must show that the employer's proffered reason was "unworthy of credence." Smith v. Allen Health Sys., 302 F.3d 827, 834 (8th Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 256 (1980))).

Sparks argues that the RIF, which resulted in $6 million in cost savings and during which 136 positions were eliminated, accounts for Wallace's discharge. Johnson-Bailey determined that Wallace's duties could be performed by other employees and that his position should be eliminated. Johnson-Bailey also eliminated her own husband's position when she eliminated Wallace's. Wallace has not shown Sparks's legitimate, nonretaliatory reason to be "unworthy of credence." Id.

Nor has Wallace shown he was discharged pursuant to an inconsistent policy, see Floyd v. Mo. Dep't of Soc. Servs., 188 F.3d 932, 937 (8th Cir. 1999), or that he was treated differently from other employees who were "similarly situated in all relevant respects," Pope, 406 F.3d at 1009. Sparks's management personnel were consistent in their assertions that Wallace was discharged pursuant to a RIF policy requiring the evaluation of an employee's job classification, employee classification, shift, and seniority. Based on this policy, Wallace was discharged because he was the

only transporter on the evening shift and the evening-shift transporter position had become unnecessary. To accept Wallace's proposition that all Sparks employees potentially affected by the RIF were similarly situated, without regard to the criteria specified by the RIF policy, would render the "all relevant respects" inquiry meaningless. And Wallace's assertion that other employees were allowed to bump less-senior employees from different positions or shifts in cascading fashion down the corporate structure is not supported by the record. Indeed, we agree with Sparks that such a policy likely would have created chaos in the organization.

In any event, we do not sit as a super-personnel department to review the wisdom or fairness of Sparks's job-elimination policies during the RIF. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). Instead, our task in this appeal is to decide whether the record reveals issues of material fact that would prevent the entry of summary judgment in favor of Sparks. This is not a case in which an employee complained of discrimination and later was discharged because of alleged shortcomings in the employee's job performance, and based on the record it cannot be inferred that Sparks chose to discharge Wallace—rather than another, less-senior employee—for a retaliatory reason. In fact, Sparks rehired Wallace to the central transport team on the day shift, and his former evening-shift position no longer exists.[4] Even if Wallace could show a prima facie case of retaliation, Sparks's legitimate motive for discharging Wallace would survive his attempts to demonstrate pretext.

---

[4]Wallace's assertion that Sparks rehired him only to mitigate his damages is unsupported by anything in the record other than the fact that the rehire occurred after Wallace filed the present lawsuit. Further, there is no evidence that any employees rehired more than thirty days after economic separation had their seniority restored.

## III.

Wallace appears to have abandoned on appeal his state-law claims for retaliation and wrongful discharge. See Br. of Appellant at 3 ("This is a Title VII retaliation case."). Because Sparks addressed those claims, however, we too will address them. Like Title VII, ACRA prohibits employment discrimination based on gender as well as retaliation for complaining about such discrimination. Ark. Code Ann. §§ 16-123-107(a)(1), 16-123-108(a) (Michie Supp. 2003). To overcome summary judgment on a retaliation claim under ACRA, a plaintiff must make the same showing as is required on an analogous claim under Title VII. See Island v. Buena Vista Resort, 103 S.W.3d 671, 676 (Ark. 2003); Flentje v. First Nat'l Bank, 11 S.W.3d 531, 537 (Ark. 2000). Consequently, Wallace's ACRA claim fails for the same reasons his Title VII claim fails, and summary judgment was proper on that claim.

To overcome summary judgment on his contract claim for wrongful discharge, Wallace, as an at-will employee, needed to show he was discharged in violation of public policy. See Sterling Drug, Inc. v. Oxford, 743 S.W.2d 380, 385 (Ark. 1988). Although a retaliatory discharge for filing an EEOC complaint likely would violate public policy, Wallace failed to show retaliation. Thus, his contract claim must fail. As to his tort claim for wrongful discharge, Arkansas has explicitly declined to recognize such a claim. Id. Therefore, summary judgment was proper on both of Wallace's state-law claims for wrongful discharge.

## IV.

We have considered all of Wallace's arguments. We hold that all of his arguments, whether or not specifically addressed in this opinion, are without merit. The judgment of the District Court is affirmed.

_____